## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
:
THERESA W.[1],                                         :          3:24-CV-00211 (RMS)
*Plaintiff,*                                           :
:
V.                                                     :
:
MICHELLE KING, ACTING                                  :
COMMISSIONER OF SOCIAL                                 :
SECURITY[2],                                           :
*Defendant.*                                           :
:          FEBRUARY 1, 2025
:
------------------------------------------------------ x

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the plaintiff's application for

disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act").  It

is brought pursuant to 42 U.S.C. §§ 405(g).[3]

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] When the plaintiff filed this action, she named then-Commissioner of the Social Security Administration, Martin O'Malley, as the defendant. (*See* Doc. No. 1).  O'Malley left the agency on November 29, 2024. Michelle King has since been appointed as Acting Commissioner.  As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michelle King should be substituted for Martin O'Malley as the defendant in this matter.

[3] Under the Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1), 1383(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ").  *See* 20 C.F.R. §§ 404.929, 416.1429.  The plaintiffs can appeal an ALJ's decision to the Social Security Appeals Council.  *See* 20 C.F.R. §§ 404.967, 416.1467.  If the Appeals Council declines review or affirms the ALJ's decision, then the plaintiff may appeal to the United States district court.  Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

The plaintiff moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner") and remanding the case for further administrative proceedings, including the calculation of benefits. (Doc. No. 14). The Commissioner, in turn, moves for an order affirming his decision. (Doc No. 16).

For the following reasons, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **GRANTED in part and DENIED in part,**[4] and the Commissioner's motion for an order affirming that decision is **DENIED**.

## I.    <u>PROCEDURAL HISTORY</u>

On May 30, 2019, the plaintiff applied for DIB benefits claiming that she has been disabled since May 1, 2007, due to multiple sclerosis and optic neuritis. (Doc. No. 10, Certified Transcript of Administrative Proceedings, dated 4/9/2024 ["Tr."] 117). The plaintiff's application was denied initially and upon reconsideration. (Tr. 117–140). On July 14, 2021, ALJ Matthew Kuperstein held a hearing during which the plaintiff and a vocational expert testified.[5] (Tr. 39). The plaintiff's then-counsel, Thomas Albin, stipulated to an amended onset date of December 1, 2012.[6] (Tr. 50, 144). The ALJ issued an unfavorable decision on August 12, 2021. (Tr. 138). On June 6, 2022, the Appeals Council remanded the plaintiff's application because the audio recording of the July 14, 2021 hearing "captured sounds that [were] unrelated to the hearing and that were not audible during the hearing." (Tr. 161). The ALJ held a second hearing on December 16, 2022, and the

---

[4] The Court grants the plaintiff's motion to remand the case for further administrative proceedings but denies it with respect to the plaintiff's request for a remand for the calculation and award of benefits.

[5] The ALJ held the hearing via videoconference due to the circumstances presented by the COVID-19 pandemic. (Tr. 42–43).

[6] If an individual proves she is disabled between the onset date and the last insured date, her disability period lasts until the earliest of: (1) the month before full retirement age under § 404.409, (2) the month immediately preceding the termination month under § 404.325, or (3) the last month a plaintiff receives benefits if she performs substantial gainful activity during the re-entitlement period under § 404.1592a. 20 C.F.R. § 404.321(c).

plaintiff was represented by Gary Huebner, who is also counsel in this appeal. (Tr. 74). On February 1, 2023, the ALJ issued a second unfavorable decision. (Tr. 14). The Appeals Council denied the plaintiff's request for review on December 29, 2023, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1).

On February 16, 2024, the plaintiff filed her complaint in this pending action. (Doc. No. 1). By the end of the month, the parties consented to jurisdiction before a magistrate judge, and the case was transferred to the undersigned. (Doc. No. 8). On May 23, 2024, the plaintiff filed her Motion to Reverse the Decision of the Commissioner with a memorandum of law (Doc. No. 14, 14-1). The Commissioner filed her Motion to Affirm with a memorandum of law on June 17, 2024. (Doc. No. 16, 16-1). The plaintiff filed her response on July 8, 2024. (Doc. No. 17).

## II.    FACTUAL BACKGROUND

The medical records demonstrate that the plaintiff suffers from multiple sclerosis with symptoms including fatigue, ataxia, incontinence, impaired balance, and numbness of the hands and legs. The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' respective statements of material facts. (*See* Doc. Nos. 14-1 at 4–24, 16-1 at 2 (incorporating the ALJ's summary of evidence and the plaintiff's statement of facts)). The Court cites only the portions of the record that are necessary to explain this decision.

### A.    The Plaintiff's Hearing Testimony

The ALJ held two hearings: the first on July 14, 2021; and the second, which was ordered after the Appeals Council remanded the case, on December 16, 2022. The plaintiff testified during both hearings. Because the ALJ refers to the plaintiff's testimony from both hearings, the Court summarizes the relevant testimony from both.

3

### 1.    July 14, 2021 Hearing

On July 14, 2021, the plaintiff testified at a virtual hearing before the ALJ concerning her DIB application. The ALJ first addressed the plaintiff's onset date and last insured date. The plaintiff testified that she last worked May 1, 2007. (Tr. 49). The ALJ stated he was "just trying to get an idea of any limitations" affecting the plaintiff, and asked her counsel: "[A]re we looking at the whole period from May 1st, 2007 or just simply since December 2012?" (*Id.*). When prompted, the plaintiff's counsel agreed to amend the onset date to December 1, 2012, stating: "Well, not much has changed since then, Your Honor. We don't need to go back to 2007. . . . I don't think it makes any difference in here except we don't need to talk about that entire period prior." (Tr. 49–50). The plaintiff then confirmed that her condition had worsened since May 1, 2007. (Tr. 50).

The ALJ asked the plaintiff to testify about her physical limitations in December 2012.[7] (*Id.*). She testified that she could not lift her leg to walk, her balance was "bad," and she would trip and/or fall down, she frequently dropped things, and she suffered from ataxia and numbness.[8] (Tr. 50, 53, 54). Due to her balance issues, the plaintiff would stay home, rather than use an assistive device, or she would use a carriage if she had to go to stores. (Tr. 55). When asked about her ability to lift, the plaintiff testified that she used to be able to lift 50 pounds, she could lift twenty pounds in December 2012, and as of the hearing date she could lift only five pounds. (Tr.

---

[7] The plaintiff also testified that her limitations were "creating problems with [her] job" like, for instance, she could not figure out how to put a piece of paper in a folder. (Tr. 50–51). The Court presumes this testimony relates to 2007, when she last worked.

[8] "Ataxia often occurs when parts of the nervous system that control movement are damaged. People with ataxia experience a failure of muscle control in their arms and legs, resulting in a lack of balance and coordination or a disturbance of gait. While the term ataxia is primarily used to describe this set of symptoms, it is sometimes also used to refer to a family of disorders. It is not, however, a specific diagnosis." Nat'l Inst. of Neurological Disorders & Stroke, *Ataxia and Cerebellar or Spinocerebellar Degeneration*, (Feb. 1, 2025), https://www.ninds.nih.gov/health-information/disorders/ataxia-and-cerebellar-or-spinocerebellar-degeneration [https://perma.cc/PK4E-D6WU].

51).  The plaintiff also testified she could not walk or stand for more than ten minutes without needing to stop or rest "when the fatigue would hit" her.  (Tr. 52).  She explained: "The fatigue would hit me so hard just out of nowhere.  It was no certain amount of time or distance, it's just when my body stops, it stops and I end up dragging my leg and I can't lift it up off the ground." (*Id.*).  The plaintiff also testified she suffered from incontinence and needed to wear a pad because sometimes she urinated without any warning.  (Tr. 53).

The plaintiff's counsel also questioned the plaintiff about her limitations.  Counsel first asked about the plaintiff's pain, and she testified that she had pain in her lower back and shoulder blade on a daily basis.  She also testified that she suffered from migraine headaches on a weekly basis, which were debilitating, causing her to need to lay down for an hour at a time.  (Tr. 56). According to the plaintiff, these migraines were exacerbated by heat.  (Tr. 61).  On days when the plaintiff did not have a migraine, she would still have to take a nap for an hour each day due to fatigue.[9]  (Tr. 57–58).  Next, counsel asked about the plaintiff's ability to ambulate despite her issues falling, and she indicated she did better on flat surfaces, she could not walk up hills or on rocky surfaces, and she could not climb stairs without a handrail.  (Tr. 57).

As to her limitations at home, the plaintiff stated that her adolescent children helped her do household chores, such as cleaning, carrying dog food, and carrying laundry up and down stairs. (Tr. 59).  When the ALJ asked how she cared for her younger child, who was three years old in 2012, the plaintiff testified that she bathed him but did not carry him.  (Tr. 60).  She also testified that she cooked, cleaned, and shopped for groceries.  (*Id.*).

---

[9] The plaintiff clarified that she could not actually take a nap every day due to her obligations to her two adolescent children.  (Tr. 58).

### 2.    December 16, 2022 Hearing

The plaintiff's testimony at the second hearing was similar to her testimony from the first hearing.  With respect to her physical limitations, she testified that her main problem was chronic fatigue along with migraine headaches, ataxia, balance issues, numbness, and incontinence.  (Tr. 84, 89).  When fatigued, the plaintiff would nap for "a couple hours" and, in 2012, she napped daily.  (Tr. 88).  To ambulate, the plaintiff used a carriage to shop but otherwise did not need an assistive device.  (Tr. 84–85).

The plaintiff also testified about information not previously discussed.  In addition to the above limitations, the plaintiff testified that, in 2012, she had hand and leg tremors.  (Tr. 92–93). For instance, the plaintiff had difficulty writing, which caused her frustration and embarrassment. (Tr. 86).  She also could not put on her shirts by herself or put on her children's shirts, and she could not button her clothing.  (Tr. 92–93).  The plaintiff's counsel asked about whether she had flare-ups characteristic of multiple sclerosis in 2012, and she testified that she did, as often as three times a year.  (Tr. 91–92).  The plaintiff described a flare-up as a "loss of sensory, it's a weird feeling in the face and the extremities" and "all of a sudden you can't, you can't do what you can normally do." (Tr. 91).  To address flare-ups, the plaintiff would need to sleep and take prednisone. (Tr. 91–92).  The plaintiff also testified about her optic neuritis, indicating it caused involuntary eye movement that was uncomfortable and painful.  (Tr. 87).

### B.    The Vocational Expert's Testimony

A vocational expert testified at both hearings, but the ALJ only cited testimony from the second hearing's vocational expert, Michael Dorval.  (Tr. 17–32).  The ALJ first asked Dorval to categorize the skill level of the plaintiff's past work history as a resident care aide.  (Tr. 100). Dorval testified that the plaintiff's description of the job was akin to a home health aide, a semi-skilled job that was generally performed at a medium exertion level.  (*Id.*).

6

The ALJ presented several hypotheticals and asked Dorval to opine about the possible substantial gainful activity with the following assumptions: the hypothetical person would have completed the twelfth grade, would be between 45 and 46 years-old, and would have the same past work experience as the plaintiff.[10]  (Tr. 101).

First, the ALJ asked Dorval to testify about available jobs if the hypothetical person had limitations of (1) lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently; (2) "two hours of standing or walking with normal breaks for a total of four hours in an eight-hour workday, two of sitting with normal breaks for a total of six hours in an eight-hour workday"; (3) occasional climbing of ramps, stairs, ladders, ropes, scaffolds; and (4) occasional balancing, stooping, kneeling, crouching or crawling.  (Tr. 101).  Dorval testified that the hypothetical person would not be able to perform the job of a home health aide but would be able to work as a ticket seller in a movie theater or public transportation facility, a parking garage/lot cashier, and a document clerk.  (Tr. 101–02).

Second, the ALJ altered the hypothetical to retain the first two limitations but prohibit climbing and balancing altogether.  (*Id.*).  The ALJ added another limitation: no exposure to extreme heat, extreme cold, humidity, hazards (e.g., no proximity to moving mechanical parts), electrical shock, radiation, explosives, or "high exposed places."  (Tr. 102).  Dorval testified that this hypothetical person could perform the same three jobs as described in the first hypothetical. (Tr. 102–03).

Third, the ALJ inquired whether the positions of ticket seller, parking cashier, or document clerk required running.  (Tr. 103).  Dorval testified that they did not.  (*Id.*).

---

[10] The ALJ asked Dorval to testify about eleven hypotheticals.  The Court will discuss only those that apply to the ALJ's determination about the plaintiff's residual functional capacity.

Fourth, the ALJ added a restriction of frequent handling, fingering, or feeling bilaterally. (Tr. 106). Dorval testified that a hypothetical person could still perform all three occupations. (*Id.*).

Dorval also testified that, based on his job placement experience, the threshold for off-task time was about ten percent. (Tr. 103). In other words, an individual could only be unproductive for 40 to 45 minutes in order to maintain full-time work. (*Id.*). The plaintiff's counsel asked whether an individual would be disqualified from a full-time job if her need for bathroom breaks or naps exceeded ten percent of the typical workday. (Tr. 111–12). Dorval testified that she would be disqualified under either circumstance. He also testified that, for an unskilled or low skilled job, consistently missing one day of work per month would be unacceptable. (Tr. 111).

## C.    Medical Evidence

The plaintiff is a 58-year-old woman who was diagnosed with multiple sclerosis in 1987. (Tr. 837–47). She began treatment with David S. Thompson, M.D., of the Neurological Group, P.C. (*Id.*). Since Dr. Thompson's retirement around 1998, the plaintiff has received treatment every six months from Dr. Joseph B. Guarnaccia, M.D., at The Multiple Sclerosis Treatment Center at Griffin Hospital. (Tr. 478–625, 796–811, 924–25). At each six-month visit, Dr. Guarnaccia performed a neurological examination, known as the Expanded Disability Status Scale ("EDSS").[11] (*Id.*).

---

[11] The EDSS is a twenty-step scale that assesses the patient's physical disability in multiple sclerosis cases. *See* Çınar B. Piri & Yorgun Y. Güven, *What We Learned from The History of Multiple Sclerosis Measurement: Expanded Disability Status Scale.* 55 Arch Neuropsychiatry S69–S75, S70 (2018 SUPP 1), https://doi.org/10.29399/npa.23343[https://perma.cc/8HRB-DX4H]. The EDSS is comprised of seven metrics known as "functional systems": Pyramidal, Cerebellar, Brain Stem, Sensory, Bladder-Bowel, Visual, Cerebral or Mental, and Other. Each functional system is scored either on a scale of one to five or one to six. The overall score ranges from "0" ("normal neurological examination") to "10" ("death due to MS") and is scored in increments of 0.5. *Id.* An overall score of "0" to "5.5" reflects an individual who can ambulate without aid. *Id.* The records indicate the plaintiff's scores ranged from 2.0 to 4.0. (Tr. 478–625, 796–811, 924–25).

When the plaintiff was diagnosed, she had just started working for the Connecticut Department of Mental Retardation as a group home resident care aide. (Tr. 119, 373–74). This job required her to walk, write, and reach for six hours per day; handle large objects up to 50 pounds (*e.g.*, laundry bags and groceries) for two hours per day; frequently lift less than ten pounds; stand, climb, stoop, kneel, crouch, and crawl for one hour per day. (Doc. No. 14-1 at 4). She performed this job for twenty years until May 1, 2007, when she retired because she could no longer perform her duties as a result of her increasing fatigue, cognitive dysfunction, ataxia, and sensory loss. (Tr. 373, 506–10).

The ALJ indicated in his decision that he "considered the evidence from at least eighteen months prior to the alleged onset date and after the date last insured," i.e. June 1, 2011 to June 30, 2014. (Tr. 17). But, on a number of occasions, the ALJ referred to Dr. Guarnaccia's records that predated June 2011. (*See* Tr. 20–29 (citing Ex. 2F at 1–5, 8–9, 11–12, 14, 18, 28–29, 36, 41, 51, 54–55, 135) (including dates in 2000, 2005–2007, 2009–2010, May 2011)).

On May 10, 2011, the plaintiff visited Dr. Guarnaccia for her regular six-month neurology appointment. (Tr. 479–81). Dr. Guarnaccia noted that the plaintiff's multiple sclerosis was stable. (Tr. 479). Still, the plaintiff had "some aching, headaches;" she complained that fatigue was the "prominent symptom," and she had to "take naps;" and she had "[l]imited endurance walking because of [the] right leg." (*Id.*). Dr. Guarnaccia gave the plaintiff an EDSS score of 2.0 and, in relevant part, noted her fatigue, urinary frequency, and ability to walk normally around the examination room. (Tr. 480).

From June 1, 2011 through June 30, 2014, the plaintiff visited Dr. Guarnaccia four more times. (Tr. 534–48 (3/23/2012, 10/1/2012, 4/1/2013, 4/21/2014)). She also received an MRI in April 2013. (Tr. 613).

The first visit during the relevant time period occurred on March 23, 2012. (Tr. 534–36). Dr. Guarnaccia noted the plaintiff's complaints of "sharp pains in her head and neck," "[l]egs jump at night," and "ongoing side effects from Avonex." (Tr. 534). He administered a neurological examination and gave the plaintiff an EDSS score of 3.0, noting the following for each functional system:

- Mental status: "fatigue"

- Visual acuity: "Visual fields full. Visual acuity normal. Pupils equal and reactive to light and accommodation. Negative Marcus Gunn pupil."

- Brainstem: "Extraocular movements intact without pathological nystagmus. No intranuclear ophthalmoplegia. Facial sensation and strength symmetrical. Tongue, uvula and palate midline."

- Motor: "mild lower extremity weakness"

- Coordination: "positive rhomberg. Decreased tandem. Decreased heel knee to shin."

- Sensory: "vibration decreased lower extremity."

- Bladder/bowel: "urinary urgency"

- Ambulation: "Negative rhomberg. Tandem gait normal. Walked normally around the exam room."

(Tr. 535).

The plaintiff next visited Dr. Guarnaccia on October 1, 2012. (Tr. 537–39). She complained that "her MS is 'flaring up;'" that she is "very fatigued, legs are numb and having urinary incontinence;" and that "[w]eather changes also affect her." (Tr. 537). Dr. Guarnaccia gave the plaintiff an EDSS score of 2.5. While her functional systems of Mental status, Visual acuity and Brainstem remained the same, for the remaining five functional systems, Dr. Guarnaccia noted the following:

- Motor: "extensor plantar responses bilaterally"

- Coordination: "slight wobble on rhomberg and slight imbalance on tandem"

- Sensory: "paresthesias"

- Bladder/bowel: "urinary incontinence"

- Ambulation: "Walked normally around the exam room."

(Tr. 538).

On April 1, 2013, the plaintiff visited Dr. Guarnaccia for her neurological examination. She reported "ongoing insomnia," "problems pulling down son's pants once" but "[n]o other cognitive episodes," and "fall[ing] twice on the ice this past winter." (Tr. 543). Dr. Guarnaccia again gave the plaintiff an EDSS score of 2.5, maintaining the same scores for each Fundamental System and writing the same information for the Mental status, Visual acuity, Brainstem, Motor, and Ambulation. For the remaining Fundamental Systems, Dr. Guarnaccia wrote the following:

- Coordination: "slight difficulty with tandem. Heel knee to shin slightly ataxic"

- Sensory: "pain"

- Bladder/bowel: "urinary urgency and rare incontinence. Has not been taking oxybutynin."

(Tr. 544).

That same day, the plaintiff got an MRI. The findings were listed as:

There is prominence of the ventricles with mild central white matter volume loss. Multiple foci of T2 prolongation are seen in the periventricular, deep, and subcortical white matter, similar to the prior study. Periventricular lesions are oriented orthogonal to the ventricular contour. There is marked thinning of the corpus callosum with involvement of its undersurface, also unchanged. Similar plaques are seen in the left cerebellum and left brachium pontis. The overall size, number, and distribution of lesions is similar to the prior study. None of the lesions demonstrate restricted diffusion. Some of the lesions demonstrate vacuolization.

There is no midline shift or mass effect. No extra-axial collection is noted. Flow-voids are preserved in the dominant intracranial vessels.

11

> There is mild mucosal thickening in the right anterior ethmoids, right sphenoid
> sinus, and the left maxillary sinus. The mastoids are clear. Orbits are unremarkable.

(Tr. 613).  In comparison with the previous MRI conducted three years prior, the radiologist's

impression was: "Similar extensive white matter disease as well as white matter volume loss

compatible with multiple sclerosis."  (*Id.*).

A year passed before the plaintiff visited Dr. Guarnaccia again.  (Tr. 546–48 (4/21/14)).  In

relevant part, she complained of worsening symptoms: "Generally, does not feel well.  Legs are

getting numb.  At night, her feet feel hot. . . . During the daytime, she doesn't have much energy

or motivation.  No pain in her legs during the daytime.  Sometimes feels weaker than before.  This

past week, started to have paresthesias in her hands."  (Tr. 546).  Dr. Guarnaccia performed a

neurological examination, giving the plaintiff an EDSS score of 2.0.  (Tr. 547).  As with previous

examinations, he wrote the same information for Mental status, Visual acuity, and Brainstem.

(*Id.*).  He revised the remaining categories with notations as follows:

- Motor: "No drift.  Fine finger movements intact bilaterally.  Normal bulk and tone in
  the upper and lower extremities.  Strength 5/5 in all muscle groups."

- Coordination: "slight tremor right finger to nose.  Slight imbalance on tandem"

- Sensory: "paresthesias"

- Bladder/bowel: "urinary urgency"

- Ambulation: "Negative rhomberg.  Walked normally around the exam room."

(Tr. 547).

The ALJ also referred to evidence that post-dated June 30, 2014.  (Tr. 24, 25, 28).  On

October 21, 2014, the plaintiff visited Dr. Guarnaccia and reported oversleeping and missing a

court appearance because she "[c]ouldn't wake up."  (Tr. 549).  Dr. Guarnaccia's impression of

her condition was "[s]table relapsing MS."  (*Id.*).  Approximately two years later, on November 2,

2016, Dr. Guarnaccia described the plaintiff's condition as "[s]table MS" and documented the plaintiff's complaints: "Has been stable but having difficulty falling asleep.  It has been going on for a while. . . . Was able to walk longer on Halloween than in previous years."  (Tr. 564).  Apart from these citations, the ALJ only generally referred to evidence from 2020 through 2022 insofar as he noted that Exhibits 11F, 13F and 14F "are relevant to the claimant's current level of functioning but not to her functioning for the period surrounding her date last insured."  (Tr. 26).

### D.    Medical Opinions

The record contains medical opinions from three individuals: the state agency consultant at the initial level, Dr. Stephanie Green; the state agency consultant at the reconsideration level, Dr. Marcia Foster; and the plaintiff's neurologist, Dr. Joseph Guarnaccia.

### 1.    State Agency Psychological Consultants

On August 25, 2019, Dr. Green issued her Disability Determination Explanation at the initial level.  (Tr. 117–25).  At this stage, the plaintiff's onset date was May 1, 2007, and the last insured date was December 31, 2012.  (Tr. 117).  The available medical records included those from the Neurological Group P.C.; Dr. Guarnaccia; the plaintiff; Daniel Kerzner, D.C.; and Yale New Haven Health.  (Tr. 118).  Dr. Green did not have the benefit of any medical source statements from Dr. Guarnaccia.  (Tr. 121–22).

Dr. Green concluded that the plaintiff was not disabled.  (Tr. 124).  With respect to her residual functional capacity ("RFC"), Dr. Green determined the plaintiff could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for four hours; sit for six hours in an eight-hour workday; push and pull without limitation; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.  (Tr. 122–23).  While Dr. Green concluded that the plaintiff had "[s]ome problems with LE ataxia on coordination testing," she found that the plaintiff did not have any manipulative, visual,

communicative, or environmental limitations. (Tr. 123). When prompted to explain the RFC more fully, Dr. Green noted: "Current RFC from AOD through DLI to present for MS with some evidence of LE ataxia on coordination testing, normal gait. TSO is not fully supported by the totality of MER in file. TS OV exam records lack exam detail. No MDI: Optic neuritis, VA and VF normal." (*Id.*). Dr. Green concluded that the plaintiff could perform sedentary work and would not be limited to unskilled work because of her multiple sclerosis. (Tr. 124). Accordingly, the plaintiff's DIB application was denied.

On December 12, 2019, Dr. Foster issued a Disability Determination Explanation at the reconsideration stage. (Tr. 127–36). The onset date and last insured date remained the same. (Tr. 127). The medical record had since been updated: it included new evidence from Dr. Michael Simeone, O.D., and supplemental records from Dr. Kerzner, Dr. Guarnaccia, and Yale New Haven Health. (Tr. 128–29). However, medical records from four additional providers remained outstanding. (Tr. 130).

After reviewing the updated medical records, Dr. Foster also determined that the plaintiff was not disabled. Specifically, she arrived at the same exact conclusions for the plaintiff's exertional limitations and RFC. (Tr. 132–34). When prompted to explain further, Dr. Foster cited medical records from April 2007 through October 2012 and one exam from April 2013. (Tr. 134). Dr. Foster incorporated Dr. Green's above explanation and added: "Severe MDI of MS not supportive of listing level severity." (*Id.*). Again, the plaintiff's DIB application was denied. (Tr. 137).

### 2.    Treating Provider

Dr. Guarnaccia submitted two medical sources statements: the first on June 30, 2021 (Tr. 806–12 (Ex. 10F)) and the second on December 12, 2022 (Tr. 924–30 (Ex. 15F)). It is undisputed that these opinions relate back to the relevant period. (Tr. 27).

a.    *First Medical Source Opinion*

The June 2021 medical source opinion is a Physical Capacity Statement that prompted Dr. Guarnaccia to check boxes and fill in short answers about the plaintiff's diagnosis, prognosis, symptoms, pain, and mental health.  (Tr. 806–12).  To complete the evaluation, Dr. Guarnaccia based his opinions on the plaintiff's history and medical file; progress and office notes; physical examinations; and X-rays, CT scans, and/or MRIs.  (Tr. 810–11).  Dr. Guarnaccia—who treated the plaintiff every six months for approximately 30 minutes each visit—listed the plaintiff's diagnoses as multiple sclerosis, sciatica, and osteopenia, with a prognosis of "fair."  (Tr. 806).  He described the plaintiff's symptoms as "chronic fatigue, lower back pain, cognitive dysfunction, bilateral leg weakness, cramping in her feet, cramping in her hands where she cannot move fingers, migraine headaches."  (*Id.*)  With respect to pain, Dr. Guarnaccia indicated the following: "[S]harp lower pain on the right side of the spine, which is exacerbated by bending; can't lift, hard to straighten up, reaching at waist level.  Her right shoulder is painful most of the time, which prevents her from lifting and reaching overhead."  (*Id.*).  Dr. Guarnaccia indicated these impairments have existed since before December 31, 2012.  (*Id.*).

Dr. Guarnaccia also was prompted to opine about the plaintiff's abilities and functional limitations in the context of a workday.  (Tr. 807–12).  He indicated that her pain would constantly interfere with, and her stress would occasionally interfere with, her ability to pay attention and concentrate.  (Tr. 807).  He stated she could not walk one block without pain, could not climb steps without a handrail, and would have problems balancing, stooping, crouching, and bending.  (*Id.*).  As for the plaintiff's need for rest, Dr. Guarnaccia opined that she would have to lie down or recline for about one hour during a workday due to fatigue, pain, stress, and migraine headaches; she could only sit, stand, or walk for five minutes before needing to change her position and could only do these activities for a total of one hour per workday; and she would have to take two, fifteen-

minute unscheduled breaks per day. (Tr. 807–08). Dr. Guarnaccia noted that the plaintiff did not use a cane because she "rarely walks" and "uses [a] cart at the grocery store," further noting she [h]as fallen." (Tr. 808). For the plaintiff's upper body limitations, Dr. Guarnaccia opined she could occasionally lift and carry five pounds or less; would have significant limitations reaching, handling, or fingering; that she could use her right and left hands to grasp, turn and twist objects and reach with her right and left arms only five percent of the day; and could not climb anything other than stairs with a railing. (Tr. 809). Dr. Guarnaccia concluded that the plaintiff would have to be "off task" more than 30% of the day, would be absent and/or unable to complete an eight-hour workday for five days or more per month, and could perform a full-time job less than 50% of a work-week. Dr. Guarnaccia listed the plaintiff's work-based limitations as "sometimes limited driving due to numbness in her feet, visual problems at night, cognitive dysfunction with memory lapses, poor bladder control, cannot tolerate heat and humidity." (Tr. 810). When prompted to answer whether the plaintiff was *unable* to retain an eight-hour workday job for five days a week, Dr. Guarnaccia opined: "Yes. Has significant fatigue, some cognitive limitations, lower back pain, bladder incontinence, [and] numbness in her extremities." (*Id.*).

### b.    Second Medical Source Opinion

In December 2022, Dr. Guarnaccia submitted a letter on the plaintiff's behalf regarding her application for social security benefits. (Tr. 924). He summarized their patient-provider relationship, indicating the plaintiff had been a patient since the late 1990s when she had a multiple sclerosis relapse. (*Id.*). Dr. Guarnaccia indicated that the plaintiff retired from her state job as a residential aide for the following reasons:

> Specifically, she was unable to perform the lifting, walking or camping required for her job; she could not be subject to temperature extremes because it made her symptoms worse. She would also suffer from daily migraines. She also had knee problems. She could not grocery shop because of her limited [sic] to walk due to her multiple sclerosis. Her job also required her to run, which she is unable to do.

(*Id.*).  Dr. Guarnaccia noted that the plaintiff's symptoms had not improved since her retirement, and she would have approximately two relapses per year.  (*Id.*).

Dr. Guarnaccia also stated that the plaintiff's current level of disability was consistent with the medical records going back to 2009.  (*Id.*).  According to Dr. Guarnaccia, the records establish "her level of fatigue, lower extremity weakness, ataxia, loss of sensation in her upper and lower extremities as well as urinary dysfunction."  (*Id.*).  He explained that the plaintiff's slow eye movements showed brain stem involvement and were consistent with her visual complaints; she had "bilateral lower extremity weakness," which was evaluated while the plaintiff was resting in the exam room and therefore did not reasonably show her ability to walk or stand for an eight-hour workday; her gait ataxia, upper extremity tremors, and reduction of sensation in her hands were inconsistent with sustained writing, gripping, and handling; and she struggled to get dressed and could no longer button shirts.  (*Id.*).  With respect to incontinence, Dr. Guarnaccia stated the plaintiff had to urinate every ten to fifteen minutes and, despite being on two medications, still urinated without warning.  (*Id.*).  These symptoms, Dr. Guarnaccia concluded, prevented her from sustaining "physical or cognitive activities for an eight hour day."  (*Id.*).

## III.    **THE ALJ'S DECISION**

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a plaintiff is disabled within the meaning of the Social Security Act ("SSA"). *See* 20 C.F.R. § 404.1520(a).[12]  In this case, the ALJ determined that the plaintiff met the insured status requirements under the SSA through December 31, 2012.  (Tr. 20).

---

[12] An ALJ determines a plaintiff's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a plaintiff is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a plaintiff is currently employed, then the claim is denied.  *Id.*  If a plaintiff is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a plaintiff is found to have a severe impairment, then the third step is to compare the plaintiff's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1

At Step One, the ALJ found that the plaintiff had not engaged in substantial gainful activity during the relevant period.  (*Id.*).  At Step Two, the ALJ determined that the plaintiff had the following severe impairments: "multiple sclerosis with allegations of fatigue, ataxia, incontinence, impaired balance, as well as numbness of the hands and legs."  (*Id.*).

At Step Three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 21).  In doing so, the ALJ considered Listing 11.09 for multiple sclerosis and concluded the plaintiff had neither extreme nor marked limitations.  *See* 20 C.F.R. part 404, Subpart P, Appendix 1, § 11.09.

Next, the ALJ formulated the plaintiff's RFC.  A plaintiff's RFC is the most they can do despite their impairments and is determined by assessing all the relevant evidence.  20 C.F.R. §§ 404.1545(a)(1).  The ALJ determined the plaintiff had the RFC to perform:

> light work as defined in 20 C.F.R. 404.1567(b) except that the claimant is limited to lifting or carrying or pushing or pulling 20 pounds occasionally and 10 pounds frequently; To standing or walking with normal breaks for a total of four hours in an eight hour workday; To work that does not require running; To sitting with normal breaks for a total of six hours in an eight hour workday; To only occasional climbing of ramps or stairs, stooping, kneeling, crouching, or crawling; To work that does not require climbing of ladders, ropes, or scaffolds or balancing; To only frequent handling, fingering, or feeling bilaterally; and To no exposure to extreme heat, extreme cold, humidity, or hazards such as proximity to moving mechanical parts, exposure to electrical shock, working in high exposed places, exposure to

of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a plaintiff's impairment meets or equals one of the impairments in the Listings, then the plaintiff is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a plaintiff's impairment does not meet or equal one of the listed impairments, then the plaintiff must show at the fourth step that she cannot perform her former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a plaintiff shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at Step Five that the plaintiff can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a plaintiff is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the plaintiff can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

> radiation, or working with explosives as these types of environmental limitations
> are defined in the selected characteristics of the dictionary of occupational titles.

(Tr. 22).  The ALJ discussed the plaintiff's testimony from her initial hearing on July 14, 2021,

noting she reported difficulty walking, balancing, lifting heavy items, putting a piece of paper in a

folder; fatigue; numbness; incontinence; migraines; optic neuritis; and a history of flare-ups.  (Tr.

22–23).  He did not discuss her testimony during the second hearing.

In addition to the plaintiff's testimony, the ALJ summarized her medical records.  (Tr. 23–

26).  While the ALJ acknowledged the plaintiff was diagnosed with multiple sclerosis in 1987, he

evaluated records that predated her December 1, 2012 onset date by eighteen months and postdated

her last insured date by eighteen months.  (Tr. 17).  According to the ALJ, the reason why he

considered evidence outside the onset date and last insured date was "for longitudinal purposes

and to provide support for the claimant's level of ongoing functioning during the relevant period

at issue."  (*Id.*).  The ALJ also noted that Exhibits 11F, 13F and 14F (records ranging from 2020

through 2022) "are relevant to the claimant's current level of functioning but not to her functioning

for the period surrounding her date last insured and thus will not be discussed further."  (Tr. 26).

He added, "The fact that the claimant was diagnosed with multiple sclerosis early on is not

determinative of whether or not she was disabled prior to her date last insured."  (*Id*.).

After evaluating the medical records, the ALJ addressed the medical opinions from two

state agency consultants and the plaintiff's neurologist, Dr. Joseph Guarnaccia.   The ALJ

concluded that the two state agency consultants were "less persuasive" because they did not have

a complete record, which would have shown the plaintiff's impairments were more severe and

limiting than what the consultants concluded.  (Tr. 26).  With respect to Dr. Guarnaccia, the ALJ

acknowledged that he had treated the plaintiff since 2000 but assigned his opinion "little

persuasiveness."  (Tr. 27).  The ALJ concluded that Dr. Guarnaccia's medical source statements

were not supported by his own findings during the relevant period and were they consistent with the overall record.  (Tr. 27–28).

At Step Four, based on the testimony of the vocational expert, the ALJ found that the plaintiff could not perform her past work as a home health aide.  (Tr. 29).

At Step Five, however, the ALJ determined that the plaintiff could perform the full range of "light work" and could perform the duties of a ticket seller, parking lot cashier, and document clerk, bench assembler, polishing job, and mail clerk, which collectively constituted "work that existed in significant numbers in the national economy."  (Tr. 30–31).  Given this finding, the ALJ found that plaintiff was not disabled from her alleged onset date to the date of the decision.  (*Id.*).

## IV.  <u>STANDARD OF REVIEW</u>

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 229 (1938)).  Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence.  *Berry v. Schweiker*, 675

F.2d 464, 467 (2d Cir. 1982). "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id*. "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## V.    <u>DISCUSSION</u>

The plaintiff raises two main arguments in this appeal. First, she argues the ALJ failed to properly consider Dr. Guarnaccia's medical source opinion concerning the impact of fatigue on her functional limitations. (Doc. No. 14-1 at 24–29). Second, the plaintiff contends the ALJ's decision was not supported by substantial evidence, because he did not find any medical opinion persuasive, relied on examinations performed when the plaintiff was resting (as opposed to examinations mirroring an ordinary work setting) and did not properly consider her incontinence. (*Id.* at 24–32).

The Commissioner challenges both arguments. With respect to the ALJ's evaluation of Dr. Guarnaccia's medical source statements, the Commissioner maintains that the ALJ properly evaluated the supportability and consistency of his opinions in compliance with 20 C.F.R. § 404.1520c, and that he was not obligated to defer to Dr. Guarnaccia's assessment. (Doc. No. 16-1 at 5–11). As to whether the ALJ's decision was supported by substantial evidence, the Commissioner states that the plaintiff could care for her children; had a "normal" gait, reflexes

and strength; and did not suffer from the level of urinary incontinence that was suggested in Dr. Guarnaccia's opinion.  (*Id.* at 19–21).

For the reasons below, the Court finds that remand is warranted, because the ALJ failed to properly weigh Dr. Guarnaccia's medical source statements.  The Court will only address those additional arguments that are necessary to provide guidance to the ALJ on remand.

### A.    Medical Opinion

A "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions," including, in relevant part, a plaintiff's "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting."  20 C.F.R. § 404.1513(a)(2)(i).

Section 404.1520c of Title 20 of the Code of Federal Regulations sets forth the parameters an ALJ must follow when evaluating the persuasiveness of a medical opinion or prior administrative medical finding.  The Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  Instead, the ALJ evaluates the medical opinions by applying the five factors listed in 20 C.F.R. §§ 404.1520c(c)(1)–(5).  These factors are: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factors.

Of these factors, supportability and consistency are the most important, and an ALJ must explicitly articulate how he considered them.  *See* 20 C.F.R. § 404.1520c(b)(2).  When considering "supportability," an ALJ is expected to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)."  20

C.F.R. § 404.1520c(c)(1).  The "consistency" factor relates to an opinion's consistency with other

evidence in the record.  "The more consistent a medical opinion(s) or prior administrative medical

finding(s) is with the evidence from other medical sources and nonmedical sources in the claim,

the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20

C.F.R. § 404.1520c(c)(2).  An ALJ may explain how he considered the other three factors, but he

is not required to do so.  *See* 20 C.F.R. § 404.1520c(b)(2).

### 1.    Supportability

The Court begins with the ALJ's assessment of "supportability."  The ALJ found that Dr.

Guarnaccia's explanations of the plaintiff's fatigue and physical limitations were not supported by

his own records.  (Tr. 27).  With respect to fatigue, the ALJ stated:

> Dr. Guarnaccia's assessment that the claimant would have difficulties maintaining
> attention and concentration during a workday is inconsistent with his own EDSS/FS
> findings showing that the claimant's cognitive issues consisted of "fatigue" with
> only mildly decreased mentation.  No cognitive deficits were identified at his other
> examinations with the claimant during the period at issue.  (Ex. 2F/41, 65).

(*Id.*).  As for her physical limitations, the ALJ found that Dr. Guarnaccia's assessment of the

plaintiff was not supported by his own findings, "which document her fatigue and decreased

coordination, but normal reflexes, intact extremity strength, and normal gait."  (*Id.*).

The parties disagree as to whether the ALJ's "supportability" determination constituted

reversible error.  The plaintiff argues that the ALJ overlooked Dr. Guarnaccia's neurological

examination findings and instead improperly relied on the fact that the overall EDSS score never

exceeded three, which the ALJ concluded meant "no more than moderate MS symptoms."  (Doc.

No. 14-1 at 25 (citing Tr. 25)).  In addition, the plaintiff contends that the ALJ incorrectly cited

evidence outside the relevant time period.  (*Id.* at 26).  The defendant maintains that the ALJ

properly relied on the EDSS score and properly considered evidence eighteen months prior to the

onset date and eighteen months after the last insured date, which established that the plaintiff did not have any cognitive deficits.  (Doc. No. 16-1 at 11–17).

After reviewing the ALJ's decision, Dr. Guarnaccia's medical opinions, and the record, the Court finds that the ALJ erred in his consideration of Dr. Guarnaccia's opinion.  As an initial matter, the ALJ's two citations to the record in this section do not support his conclusion.  One citation concerns a neurological examination from 2005, when the plaintiff was still working.  (Tr. 519 (2F at 41)).  The second citation stems from a neurological examination in April 2013.  Dr. Guarnaccia noted the plaintiff "[h]ad problems pulling down son's pants once.  No other cognitive episodes."  (Tr. 543 (2F at 65)).  In determining that the plaintiff had "no cognitive deficits" other than fatigue, the ALJ completely ignored Dr. Guarnaccia's explicit reference to an instance he referred to as a cognitive episode.

The ALJ's failure to cite to supportive evidence is not harmless, as Dr. Guarnaccia's own records during the relevant period are replete with medical evidence establishing the plaintiff's fatigue.  Broadly speaking, Dr. Guarnaccia noted the plaintiff's fatigue in every single neurological examination during the relevant period.  (Tr. 534–48).  Specifically, Dr. Guarnaccia repeatedly noted the plaintiff's fatigue impacted her daily functioning: in May 2011, he indicated, "Fatigue prominent symptom," (Tr. 479); in October 2012, he described her as "very fatigued" and wrote that "[w]eather changes also affect her," (Tr. 537); in April 2013, he noted "ongoing insomnia," (Tr. 543); in April 2014, he stated, "Generally, doesn't not feel well.  During the daytime, she doesn't have much energy or motivation. . . . Sometimes feels weaker than before," (Tr. 546–47).[13]  A medical provider is permitted to rely on the plaintiff's subjective complaints to assess her

---

[13] Because the ALJ discusses the May 2011 neurological examination in his decision, the Court incorporates it here notwithstanding it falls outside the period which the ALJ deemed relevant. (*See* Tr. 28).

fatigue. *See Stacey v. Comm'r*, 799 F. App'x 7, 9 (2d Cir. 2020) ("A medical diagnosis will often be informed by the patient's subjective description of his or her symptoms."); *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that Dr. Helfand also relied on Green–Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as [a] patient's report of complaints, or history, is an essential diagnostic tool.") (internal quotation marks omitted).   Because Dr. Guarnaccia's medical opinion about the plaintiff's fatigue is supported by substantial evidence in his own records, the ALJ's error regarding his "supportability" finding was not harmless.

Turning to the EDSS evaluations, the Court agrees with the plaintiff that the score itself is not dispositive of the plaintiff's ability to function in the workplace.  Dr. Guarnaccia explained as much: "Her EDSS scores, which have consistently varied from 2 to 4 are consistent with her complaints.  The records document[ ] her level of fatigue, lower extremity weakness, ataxia, loss of sensation in her upper and lower extremities as well as urinary dysfunction." (Tr. 924).[14]  Rather than acknowledging the shortcomings of the EDSS evaluation, the ALJ found, "Dr. Guarnaccia's assessment that the claimant would have difficulties maintaining attention and concentration during a workday is inconsistent with his own EDSS/FS findings showing that the claimant's cognitive issues consisted of 'fatigue' with only mildly decreased mentation." (Tr. 27).  In another section of his decision, the ALJ summarily concluded that an EDSS score of three reflects "no more than moderate MS symptoms." (Tr. 25).  In both instances, the ALJ is reaching a conclusion about the EDSS score that contradicts plain statements made by the treating physician.  Whereas Dr. Guarnaccia found that the EDSS score was consistent with the plaintiff's complaints, such as

---

[14] The EDSS is "known to be inadequate in terms of assessing cognitive functions and MS-related cognitive deterioration."  Piri & Güven, 55 Arch Neuropsychiatry at S73.

her level of fatigue, the ALJ ignores these statements and emphasizes that the EDSS score itself translates into multiple sclerosis with mild symptoms.

Multiple sclerosis is a highly complex nervous system disease. It varies from person to person and can change annually or even daily. Nat'l Multiple Sclerosis Soc'y, *What is Multiple Sclerosis*, (Feb. 1, 2025), https://www.nationalmssociety.org/understanding-ms/what-is-ms [https://perma.cc/E54E-HFC8]. The district court said as much in *Morales v. Commissioner of Social Security*, No. 1:18-cv-6906, 2020 WL 5752182 (E.D.N.Y. Sept. 25, 2020), a case cited with approval in the Commissioner's brief. There, the court explained that the ALJ must consider the "specific characteristics of MS," as "[i]t is a chronic, progressive condition that is subject to periods of remission and exacerbation." *Id.* at *2. Accordingly, "it is error to focus on periods of remission" rather than the whole record. *See id.* Likewise, selectively choosing evidence of less-severe symptoms and ignoring the worst and most persistent symptoms fails to consider the complexity of the disorder. *See id* at *2–3.

As with the ALJ in *Morales*, the ALJ's explanation about the EDSS score here ignores the weight of the plaintiff's symptoms, emphasizing only the portions of the record when the plaintiff's symptoms waned. For example, on March 23, 2012, Dr. Guarnaccia noted the plaintiff had "mild lower extremity weakness," decreased coordination in her lower extremity, vibration in her lower extremity, and urinary urgency. (Tr. 535). Six months later, Dr. Guarnaccia noted the plaintiff was "very fatigued, legs are numb and having urinary incontinence;" that the "[w]eather changes also affect her;" she had slight balance issues; and she suffered from "extensor plantar responses bilaterally," i.e. abnormal responses in the soles of her feet. (Tr. 537–38). In 2013 and 2014, the plaintiff continued to experience a range of fatigue, imbalance issues, abnormal responses in the soles of her feet, urinary dysfunction, and numbness and/or paresthesia in her limbs. (Tr. 544–

48).  Ignoring these findings, the ALJ concluded that the plaintiff had "normal reflexes" and "intact extremity strength."  (Tr. 27).  But in doing so, he appears to have relied on reflex evidence outside the relevant period (Tr. 438 ("DTRs normal" 11/16/2010)) and one isolated incident of normal strength (Tr. 547 (normal muscle tone 4/21/2014)).  Similarly, the ALJ relied on the fact the plaintiff could walk normally around the examination room to support his finding she could sustain an eight-hour workday, even though Dr. Guarnaccia explained that the examinations were performed at rest and could not reasonably predict a patient's ability to sustain work.  (Tr. 924).  Accordingly, the weight of the relevant records supports Dr. Guarnaccia's findings, not the ALJ's.

The Court further notes that the ALJ misconstrued Dr. Guarnaccia's medical opinion about the plaintiff's limitations with maintaining attention and concentration.  For the first medical source opinion, Dr. Guarnaccia was prompted to answer specific questions about the plaintiff's symptoms and ability to function in the workplace.[15]  (Tr. 806–11).  In relevant part, Dr. Guarnaccia opined that the plaintiff's pain would "constantly interfere" with her ability to pay attention to, and concentrate on, simple work tasks.  (Tr. 807).  He also found her stress would "occasionally interfere" with her ability to pay attention and concentrate.  (*Id.*).  To properly assess the "supportability" factor, the ALJ should have evaluated Dr. Guarnaccia's medical records regarding her pain and stress.  Instead, the ALJ focused on "cognitive issues," stating that evidence of her "fatigue" and "only mildly decreased mentation" did not support Dr. Guarnaccia's findings that she would have difficulty maintaining attention and concentration.  (Tr. 27).  Such "cognitive issues" are distinct from pain and stress.  *See* Piri & Güven, 55 Arch Neuropsychiatry at S73 (in the multiple sclerosis context, "cognitive issues" generally refer to "attention, conceptualization,

---

[15] An ALJ need not separately articulate each medical opinion from a single provider.  20 C.F.R. § 404.1520c(b)(1).  In this particular circumstance, only Dr. Guarnaccia's first medical opinion discussed the plaintiff's ability to maintain attention and concentration.

problem solving, information processing, working memory, and verbal fluency").  By way of analogy, the ALJ compared apples to oranges.  Because he incorrectly compared symptoms, the ALJ failed properly to evaluate supportability.

### 2.    Remaining Factors

Having concluded that the ALJ erred in comparing Dr. Guarnaccia's medical opinion to his relevant treatment records, the Court does not address separately the remaining factors under 20 C.F.R. § 404.1520c(c).  The Court notes, however, that the ALJ should consider these factors on remand.

*Consistency.*  The ALJ must evaluate Dr. Guarnaccia's medical opinion in comparison with "other medical sources and nonmedical sources."  20 C.F.R. § 404.1520c(c)(2).  The Court notes that the ALJ did not compare Dr. Guarnaccia's medical opinion to any other medical source in the record, but it does not appear that any other providers submitted records for the relevant time period of 2011 through 2014.  Relevant evidence may not exist.  But if it does, the record should be supplemented.

As to whether Dr. Guarnaccia's opinion was consistent with the plaintiff's testimony, the ALJ appears to have read inconsistency where none existed.  For example, the ALJ opined, "At a 2011 medical visit, the plaintiff was noted to take naps, but there was no indication that she required ongoing naps at that time despite her testimony related to regular nap taking during the period (Ex. 2F/1)."  (Tr. 28).  Here, Dr. Guarnaccia's record mirrors the plaintiff's testimony.  Dr. Guarnaccia was not required to note the plaintiff's nap schedule at every examination, particularly where general evidence of fatigue could encompass specific testimony about how the plaintiff's fatigue manifested.  This is also true where the plaintiff testified about completing daily tasks notwithstanding her difficulty doing so.  *See Colgan v. Kijakazi*, 22 F.4th 353, 363 (2d Cir. 2022) ("There is some evidence that Colgan, a single mother, could to some extent care for her two young

children and engage in activities necessary to her own welfare. But we cannot say that these make a treating physician's findings flawed and foreclose an applicant's entitlement to disability benefits.").

*Relationship with the claimant* and *Specialization.* The defendant is correct that the ALJ need not explain how he considered these factors. 20 C.F.R. § 404.1520c(b)(2). But, in this case, these factors do weigh in favor of a conclusion that Dr. Guarnaccia's opinion was persuasive. 20 C.F.R. §§ 404.1520c(c)(3) and (4) (requiring that the factors of relationship to the claimant and specialization be considered). The plaintiff has treated with the same provider since before 2000 and has only had two neurologists since 1987. She has a lengthy treating relationship with Dr. Guarnaccia, and his specialty is in treating multiple sclerosis. In light of the fact that the ALJ found the state agency consultants' opinions, rendered in 2019, had "little persuasiveness," the ALJ should reexamine the import of Dr. Guarnaccia's specialty and treating relationship with the plaintiff.

*Other factors.* The parties do not address whether other factors apply, but, if they do, they should be considered on remand. *See* 20 C.F.R. § 404.1520c(c)(5).

### B.  <u>Residual Functional Capacity Determination</u>

An RFC is dependent, in part, on a proper evaluation of the medical opinions, so the Court does not address the RFC determination here. On remand, the ALJ must re-evaluate the RFC based on a proper review of the medical opinion evidence.

### C.  <u>Relevant Period</u>

When the case was initially filed, the plaintiff indicated her onset date was May 1, 2007. (Tr. 117). Following the ALJ's prompting at the first hearing, the plaintiff's counsel stipulated to an onset date of December 1, 2012, and a last insured date of December 31, 2012. (Tr. 49–50). In

the decision, the ALJ expanded the one-month relevant time period to eighteen months prior to the onset date and eighteen months after the last insured date "for longitudinal purposes." (Tr. 17).

In this appeal, plaintiff's counsel does not explicitly challenge the December 1, 2012 onset date or the ALJ's determination of the relevant period. However, plaintiff's counsel also does not seem to concede or indicate that the onset date is December 1, 2012 or, as a result, that the relevant time period is the eighteen months before and after December 2012. For instance, counsel's only reference to "onset date" is: "The Plaintiff applied for a period of disability and disability insurance benefits on May 30, 2019 with an alleged disability onset date of May 1, 2007." (Doc. No. 14-1 at 2). When addressing the relevant period, plaintiff's counsel cited evidence ranging from 2006 to 2012. (*See, e.g., id.* at 25 ("Here, the record contains extensive support for Dr. Guarnaccia's assessment of the plaintiff's chronic fatigue over the relevant period prior to her DLI (R. 515, 512, 506, 500-501, 491, 486, 482, 479, 535, 537).)). Similarly, counsel refers to evidence from 2005 and 2013 as "evidence outside the relevant period." (*See id.* at 26 ("To support his conclusion that Dr. Guarnaccia did not identify cognitive deficits at his examinations, the ALJ cites to evidence outside the relevant period (R. 27). Exhibit 2F page 41 was generated in 2005 (R. 519) and page 65 in 2013, after the plaintiff's DLI (R. 544).").

Accordingly, the onset date and relevant period are unclear. Indeed, both parties cite evidence that spans even beyond the ALJ's expanded relevant time period. (*See* Doc. No. 14-1 at 4–23 (Statement of Facts ¶¶ 2–45, 53–89); Doc. No. 16-1 at 14 (citing Tr. 483, 492, 495, 498, 501, 504, 509, 550, 559, 565, 579, 582, 585, 591)). Even the ALJ, on occasion, appeared to rely on evidence outside of his expanded relevant period. (Tr. 27–28 (citing Tr. 479, 482, 519, 529, 549); *see also* Doc. No. 16-1 at 14 (citing Tr. 27–28 and the instant citations as evidence that the ALJ's assessment of Dr. Guarnaccia was supported by "substantial evidence")). On remand, the parties

and the ALJ should clarify the onset date, consider what time period is relevant for the disability determination, and adhere to that period in their submissions and decision.

### D.  <u>Remand for Further Administrative Proceedings Is Appropriate</u>

While the plaintiff seeks an order reversing and remanding to the Commissioner for the payment of benefits, (Doc. No. 14-1 at 1), the Court declines to do so.  "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'"  *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  The Court has reviewed the record and finds that the plaintiff has not provided persuasive proof that, during the relevant time period, she was disabled.  Indeed, the parties and the ALJ cite evidence outside the relevant time period, and so further proceedings are required to evaluate the plaintiff's ability to work in light of the relevant medical evidence.  Moreover, the ALJ must reevaluate the persuasiveness of Dr. Guarnaccia's medical opinions consistent with this decision.  Whether Dr. Guarnaccia's medical opinion is ultimately persuasive may be relevant to whether the plaintiff is disabled during the relevant time period and entitled to benefits.  As such, "[r]emand for calculation of benefits would [] be inappropriate."  *Id*.  Therefore, this matter is remanded to the Commissioner for further administrative proceedings consistent with this Ruling.

### VI.  <u>CONCLUSION</u>

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 14) is **GRANTED in part** and **DENIED in part** to the extent the plaintiff seeks remand for the payment of benefits.  The Commissioner's motion to affirm that decision (Doc. No. 16) is **DENIED**.  The Court remands the case to the Commissioner to reevaluate Dr. Guarnaccia's medical opinions and properly explain the persuasiveness of his opinion in compliance with 20

C.F.R. § 404.1520c.  After doing so, the ALJ shall reevaluate the plaintiff's RFC in light of the medical evidence.  The parties and the ALJ shall also revisit the onset date, relevant period, and evaluate the evidence accordingly.  The Clerk shall enter judgment, remand this matter to the Commissioner, and close this case.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure.  Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. See 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

The Clerk is further instructed that, if any party subsequently appeals to this court the decision made after remand, the appeal shall be assigned to the undersigned as the parties have consented the Court's jurisdiction.

It is so ordered this 1st day of FEBRUARY 2025, at New Haven, Connecticut.

_____/s Robert M. Spector_____
Robert M. Spector,
United States Magistrate Judge